**COMMERCIAL DISTRIBUTION CENTER, INC., Appellant,**

v.

**ST. REGIS PAPER COMPANY, Crepaco, Inc., Ramey Construction Company, and Huxtable-Hammond Company, Inc., Respondents.**

**No. WD 34450.**

Missouri Court of Appeals, Western District.

Feb. 13, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 2, 1985.

Application to Transfer Denied May 29, 1985.

Glenn E. McMann, Stephen D. Manz and Theresa S. Hall, Kansas City, for appellant; Knipmeyer, McMann, Fish & Smith, Kansas City, of counsel.

Shugart, Thomson & Kilroy, Kansas City, for St. Regis Paper Co.

Morris, Larson, King, Stamper & Bold, Kansas City, for Ramey Const. Co.

Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for Huxtable-Hammond Co., Inc.

Before PRITCHARD, P.J., and SHANGLER and BERREY, JJ.

PRITCHARD, Presiding Judge.

Plaintiff is the owner of an underground refrigeration facility, which was equipped with brine lines suspended from the ceiling, which lines carried coolant in two of its storage rooms. On August 24, 1977, the support system of the brine lines in the two storage rooms collapsed, resulting in merchandise in storage being crushed and destroyed by the brine lines and the spilled brine. In January, 1982, plaintiff's first amended petition was filed against all defendants alleging claims for damages in strict liability (defective design, materials or manufacture of the refrigeration system, brine lines and their component parts) and in negligence, against defendants St. Regis, Huxtable-Hammond and Ramey, based upon failure to design, manufacture, distribute, construct and install the refrigeration system, brine lines and component parts adequately to support them. Damages were prayed for in the amount of $338,973.00. At the close of plaintiff's evidence, the trial court sustained defendants' motions for directed verdict and entered judgment against plaintiff.

■ Defendant, Crepaco, Inc., was alleged to have acquired the Creamery Package Division of St. Regis, by which Crepaco agreed to assume any and all of St. Regis' liabilities, excepting those covered by its insurance. No evidence was adduced as to what, if any, liability Crepaco assumed, and the directed verdict and judgment in its favor must therefore be affirmed.

The storage facility was originally a limestone mine owned by Overland Distribution Center which hired Ramey as general contractor to transform the mine into an underground cold storage facility in 1969. Ramey then subcontracted with the C.P. Division of St. Regis to design and install a refrigeration system in the facility. St. Regis then contracted with Huxtable-Hammond for the actual installation of the system.

The installed refrigerator system consisted of brine lines, supported by hundreds of hangers hung from the ceiling. The hangers were affixed to the ceiling by U-shaped clevises, or brackets, which were welded to the bottom part of a roof plate. At the bottom of the clevises was a hole through which the hanger rods passed, and the rods were attached to a bottom plate which supported the lines, a trapeze-like installation.

In 1974, the property was transferred to the Aetna Life and Casualty Insurance companies, and was later purchased that same year by plaintiff. On August 24, 1977, the support system for the brine lines

failed. The U-shaped clevises broke at their corners or curves leaving the "legs" of the clevises still welded to the ceiling plate, but allowing the rods extending downward to another plate which supported the brine pipes, to fall downward, thus causing the pipes to fall to the floor.

An essential element of the plaintiff's case is the identification of any named defendant as the designer, manufacturer or supplier of the alleged defective product, here the U-shaped clevises which broke.

Defendant Ramey was the general contractor on the job to convert the mine into an underground storage facility for the original owner, Overland Distribution Center. It is nowhere to be found in the documents filed with this court that Ramey ever undertook to design, manufacture or supply any of the clevises which were installed on the system. Rather, as indicated in its letter to St. Regis of December 18, 1969, Ramey specified that it was to provide concrete bases for St. Regis' equipment and to set anchor bolts, as well as to furnish and install all roof bolts for any support of equipment or piping furnished by St. Regis. St. Regis was required to furnish labor, materials and equipment to comply with design criteria and area shown on plans prepared by Calvin Shoup, an engineer employed by Overland. Shoup's document, *if* in evidence is not deposited with this court. Ramey's December 18, 1969 letter recited that it was to be the contract for St. Regis to proceed with the acquisition, design and installation of the system as outlined in the latter's letters of October 7, 1969 and December 2, 1969. The December 2 letter noted that St. Regis would have the right to modify the design and specifications on equipment to reach the maximum contract price. The October 7 letter is more significant. St. Regis therein made its quotation for various items of refrigeration equipment, and Item # 4 specified, "1—Lot of Brine, Water, and Ammonia Pipe, Fittings, Hangers, misc. Hanging Rod and Rigging material to install equipment in three—5 deg. F. rooms, humidity control room, engine room, and air conditioning area, comprising the initial 800,000 sq. ft. project." In another letter from Ramey to St. Regis dated March 2, 1970, Ramey requested that the St. Regis mechanical contractor coordinate with Ramey concerning the installation of clevises for hanging piping, refrigeration units, etc., as soon as possible inasmuch as Ramey was installing the roof bolts at the perimeter of the freezer room.

■ Under the foregoing evidence, Ramey had but a small part of the installation of the refrigeration system. Its duty, one principally for services, was to carry out the plans, specifications and directions given it by the owner, Overland, who apparently had them prepared by its engineer, Calvin Shoup. There is a lack of positive evidence that Ramey had anything to do with the design, manufacture or installation of the alleged defective clevises. See Prosser and Keeton on The Law of Torts, § 104A, p. 723–724 (1984). There appears, under the evidence, no basis to hold Ramey liable under strict liability in tort [cf. *Chubb Group of Insurance Companies v. C.F. Murphy & Associates, Inc.*, 656 S.W.2d 766, 780[20] (Mo.App.1983) ], or in negligence (because of no duty owed), and the trial court did not err in directing a verdict in its favor.

■ The situation is different, however, with St. Regis. The evidence is clear that by Ramey's subcontract, in pertinent parts set forth above, with it, St. Regis did undertake the obligation to design, supply and install the clevis. Plaintiff's Exhibit 7, St. Regis's drawing, shows the design of the clevis as described above, although that drawing does note that clevises are "To be furnished by others". St. Regis had a further drawing dated 1–19–70, Plaintiff's Exhibit 8, which recites that the mechanical subcontractor was "To furnish & install all ammonia, brine, steam, gas, & water pipe, fittings, unions, hanger supports, expansion joints, * * *." Under the evidence, St. Regis delegated this duty, along with others, to its mechanical subcontractor, Huxtable-Hammond: "When a duty is delegated, however, the delegating party continues to

remain liable. If this were not so, every solvent person could obtain freedom from his debts by delegating them to an insolvent. Delegation involves the appointment by the obligor of another to render performance on his behalf. It does not free the obligor from his duty to see to it that performance is rendered." Calamari and Perillo, The Law of Contracts, 2d Ed. (1977) § 18–24, p. 662.

The subcontract between St. Regis and Huxtable-Hammond does not specifically state that the latter was to undertake the design, manufacture and installation of the clevises. It does, however, reference Plaintiff's Exhibit 7, which shows a drawing of the clevis to be supplied by others, and Huxtable-Hammond was to furnish and install the hangers and supports, as shown by Plaintiff's Exhibit 8. The evidence as to source, i.e. who manufactured the clevises, is nonexistent. Huxtable-Hammond's superintendent of mechanical construction, Silas Farmer, testified that he had no idea where the U-shaped brackets came from, but he would say they came through Huxtable-Hammond's shop, although they were not something which could have been fabricated in its shop as opposed to being bought from another supplier. The clevises showed up on the job, where he decided which roof bolts and washers that the clevises would be attached to, and he decided the number of clevises which would be put up. Al Petzold, Huxtable-Hammond's project manager, testified that it was to set the equipment on someone else's foundation, install and test the piping, hang the units and help fill the brine system. The materials which it supplied were the pipe, valves, fittings and secondary hangers which would be the clevises. The primary hangers were the roof bolts, furnished by others. Huxtable-Hammond installed the (clevises) because it could not stand the lost time. In Calamari and Perillo, supra, § 18–26, p. 665, it is said, "Often, however, the delegate assumes the duty which has been delegated to him [as Huxtable-Hammond did here]. * * * In such a case the delegate is liable to both his promisee and to the third person who is a third party

creditor beneficiary of the delegate's promise."

Under this evidence, it is sufficiently established for the jury to determine that St. Regis and Huxtable-Hammond designed, supplied and installed the alleged defective clevises.

Some two months after the brine lines had collapsed, Dr. Donald Gibson, a mechanical and metalurgical engineer, visited the storage facility. At that time, the brine pipes, being ten, twelve and fourteen inches in diameter, had been put back into place. Dr. Gibson went to a room where the fallen debris had been stored and obtained clevises, rods and pieces of pipe from salvage, given to him by David Waller, plaintiff's general manager. Some of the clevises had failed, others had not, and these were taken by him for analysis in the future. He was able to determine that the salvage parts had been involved in the collapse. Dr. Gibson left the mine and returned to Columbia and made a metalurgical analysis of the available samples, and did physical testing to determine the strength of the various brackets (clevises) which he had in his possession. The physical test he did was to pull the brackets to determine their strength, an evaluation done at room temperature on brackets which had been in the mine for some time, and on those which were identically similar. He repeated the tests at zero degrees Fahrenheit. The tests disclosed that the strength at room temperature of both used and unused brackets was practically the same, but at zero degrees Fahrenheit the strength of the used bracket was dramatically lower than those which had not been used. The used brackets had lost strength down to less than half of their room temperature strength. Dr. Gibson made a microscopic examination of the structure of the metal to determine how it had been formed and what effect the environment had on the metal. He found that the brackets had been bent cold, and at the U-shaped bend the material had been very severely cold worked in the localized area of the bends. It was obvious to Dr. Gibson

that from the decrease in strength of the brackets at zero degrees Fahrenheit, that the materials had undergone ductile [a metal capable of being permanently drawn out, or hammered thin, or being molded or worked. Webster's New International Dictionary, 2d Edition] to brittle transition temperature change. Dr. Gibson further testified that when a piece of material is "cold bent" it is subject to distortion in a very localized area and a potential for accelerated corrosion in the area of the localized bend. He gave his opinion as to what caused the brackets (clevises) to fail: "A. The clevis—had been fabricated from a material which would undergo a ductile to brittle transition by the time it reached the cold storage temperature that it had to survive in. That's a conclusion, number 1, which indicates a wrong material had been chosen with respect to alloy content for that bracket. Number 2, in processing the bracket, this very sharp cold bend did two things, first of all it created an abnormal high stress concentration factor, which is proportional to the radius of the bend; and, second, it left the material in that localized area, in what we call a high energy state, which causes it to undergo an accelerated corrosion in the very localized area of the bend." Dr. Gibson made computations of the weight load the clevis would handle and found that at room temperature, seventy-eight degrees Fahrenheit, the clevises, which had been in use would support 22,-187 pounds to failure; at zero to minus five degrees below zero, the weight load dropped to 8,300 pounds. There was evidence that because of humidity, there was four to six inches of frost built up on the brine line. Dr. Gibson testified that the density of frost, eight-tenths that of water, weighs 49.92 pounds per cubic foot. He calculated that four inches of frost would constitute seventy-two pounds of load per running foot on a twelve inch line; seventy-eight and a half pounds per running foot on a fourteen inch line; and sixty-one pounds per foot on a ten inch line.

On deposition, Dr. Gibson testified that he had not seen the plans of the cold storage system, but if he did any additional work opposing counsel would be notified which he failed to do. Dr. Gibson was not allowed to give any testimony or conclusions with respect to the adequacy of the plans, which plaintiff's counsel learned shortly before trial would be in evidence. In addition to his tests, set forth above, he did give his opinion as to the proximate cause for the particular clevises to have failed: "A. The failure was caused because of overload, as one factor, the fact that the material had undergone a ductile to brittle transition by the time it had reached zero Fahrenheit or the cold storage temperature—room temperature, and that as such had become very susceptible to stress concentration, which was caused by the method of forming, as well as the normal anticipated corrosion which occurred in the environment in which it was placed."

David L. Waller, plaintiff's Vice President and General Manager, testified: He was present about thirty minutes after the brine lines had collapsed, and saw legs of some of the clevises still attached to the ceiling plate—the bottom portions of the clevises were broken. A decision was made to clean up and restore the brine lines to prevent further damage to stored products, and that was accomplished in about two weeks, using a contractor. The debris was moved to another room from which Waller or someone under his control supplied Dr. Gibson with the items which he examined and tested. Waller testified that the total length of the brine lines which fell was about 2,200 to 2,400 feet. There was a lot of crushing when the pipes fell on stored products, and the salt water and a rust inhibitor destroyed the products. Smaller, two and a half inch, feeder lines, which fed the brine to air handlers, fell and broke also with the larger brine lines. There was no practical way to defrost the brine lines, but the air handlers had an automatic warm brine defrost system. Waller had never observed any damage to the brine lines caused by forklifts coming into contact with them.

■ Plaintiff proved all of the elements to establish strict liability in tort against St. Regis and Huxtable-Hammond under *Keener v. Dayton Electric Manufacturing*

*Company,* 445 S.W.2d 362 (Mo.1969), which adopted the guidelines therefor of Restatement, Law of Torts (Second) § 402A. Defendants sold (supplied) the cold storage equipment to plaintiff's predecessor, Overland. The testimony of Dr. Gibson, if believed by the trier of the fact, establishes that the suspension clevises were defectively designed, in that they had lost half of their room temperature strength at the very cold environment in which they had been placed which was necessary to their proper use. He determined that the clevises had been cold bent, resulting in their going through a ductile to brittle temperature change, resulting also in distortion and a potential for accelerated corrosion. His opinion was that the wrong material had been chosen with respect to alloy content. As noted above, Dr. Gibson gave his further opinion as to the proximate cause of the clevises failure, which tracked his findings from the tests which he had made. The clevises were installed in 1970, and the collapse occurred about seven years later. The jury could find that the clevises were defective in design when supplied and installed, which in that condition were unreasonably dangerous to plaintiff as a user.

■ There was no question but that St. Regis and Huxtable-Hammond were in the business of selling and supplying the clevises as a product pursuant to their subcontracts with Ramey. A supplier is in the same position as a seller under the doctrine of strict liability in tort. 72 C.J.S.Supp. Products Liability, § 40, p. 60. See also the *Chubb* case, supra, page 781[22], holding that Kansas City Structural Steel might be strictly liable for *providing* and welding steel beams in place, and Bethlehem Steel Corp. might also be liable in *providing* allegedly defective steel bolts to secure the Kemper Arena roof supports. Note *Gabbard v. Stephenson's Orchard, Inc.,* 565 S.W.2d 753 (Mo.App.1978), holding that the orchard was subject to the rule of strict liability as a lessor or bailor (supplier) of defective applepicking ladders in the usual course of its business. As stated in *Gunderson v. Sani-Kem Corp.,* 674 S.W.2d 665, 668 (Mo.App.1984), the word

"sells" is merely descriptive, and the test for determining the applicability of the rule (of strict liability) is not the sale of the product, but rather the placing thereof in commerce. "Thus, liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it has been injected in the stream of commerce by other means." The evidence is clear that St. Regis and Huxtable-Hammond were engaged in the business of selling, supplying and installation of refrigeration pipes and fixtures such as the one done for plaintiff, so the second element of the Restatement rule and the Keener case is satisfied. Plaintiff had never done any alteration to the pipes which collapsed since their installation, so the third element, that the equipment reached it without substantial change, is likewise satisfied.

The evidence tends to show that plaintiff used the equipment, pipes and hanger equipment, in the manner that it was intended—to convey chilled brine to air handlers in order to super cool refrigeration rooms. There was evidence that plaintiff occasionally used forklifts to dislodge accumulated frost or ice (a foreseeable consequence of intended use) from the brine lines, but there was no evidence that such practice ever damaged any part of the system.

■ Considering all of the evidence in its light most favorable to plaintiff, it was sufficient to prove that St. Regis and Huxtable-Hammond jointly designed, supplied and installed the alleged defective system, and the trial court erred in directing a verdict against plaintiff and in their favor on the claim of strict liability in tort.

■ In Count II, plaintiff alternatively pleaded that St. Regis and Huxtable-Hammond were negligent jointly, or in the alternative, severally, basically, in failing to design, distribute and install an adequate brine line system, brine lines and supports adequately to sustain the expected applied load in the cold atmosphere where they were used, and in failing to test and inspect hanger brackets to determine that they were adequate to support the

brine lines and prevent their failing. Variations of the various themes of negligence are contained in the several paragraphs of Count II. Liability in products liability cases may be predicated on the theory of negligence. "As liability arises in accordance with general principles of negligence, there must be a duty imposed on a manufacturer, seller, or other supplier, with respect to foreseeable dangerous consequences of a product; and the failure to adhere to such a duty constitutes fault, or negligence." 72 C.J.S.Supp. Products Liability, § 9, p. 15. The original owner, Overland, was the contracting party with Ramey and through the subcontracts with St. Regis and Huxtable-Hammond, by which the latter undertook to design, supply and install the alleged defective clevises. If the clevises were so designed, using materials which were inadequate to forming, so that they would become brittle and be subject to accelerated corrosion, as the proof tends to show, then their failure was foreseeable by St. Regis and Huxtable-Hammond, and there would exist no requirement of privity between them and plaintiff. *Chubb*, supra, p. 774; cf. *Begley v. Adaber Realty & Investment Company*, 358 S.W.2d 785 (Mo.1962). There was evidence from which it could be found that the defects in the clevises existed at the outset, so Huxtable-Hammond's cited case of *Crowder v. Vandendeale*, 564 S.W.2d 879 (Mo. banc 1978), a deterioration case resulting from latent structural defects, is inapplicable. *Vanacek v. St. Louis Public Service Company*, 358 S.W.2d 808 (Mo. banc 1962), does not aid St. Regis, for there by contract, the city relieved defendant of the duty to maintain street railway tracks, in which there was a defect of the surface between the rails which caused plaintiff's injuries, the holding being that when the duty to repair ends, liability for future injury to disrepair ends unless there is concealment or other circumstances. There was sufficient evidence for reasonable minds to find that the collapse was proximately caused by the defective part under the negligence theory also. The issue was for the jury to determine, and the court likewise erred in directing a verdict for St. Regis and Huxtable-

Hammond on the alternative theory of negligence.

The trial court did not, in its discretion, err, in excluding opinion testimony of Dr. Gibson as to any defects in the plans and specifications as contributing to the collapse, because it had not been revealed that he had prior to trial examined those documents, it being agreed that defendants would be advised of any such examination. On retrial, no such surprise will exist, if upon further discovery, Dr. Gibson's opinion, if any, is revealed so that defendants may meet that testimony. Other questions relating to the sufficiency of objections and foundations as to expert testimony may not recur on new trial, and need not be addressed.

The judgments in favor of Ramey and Crepaco are affirmed. The judgments in favor of St. Regis and Huxtable-Hammond are reversed and as to them the case is remanded for new trial.

All concur.