E. Jeanne MORRISON, Clifton Morrison,
Mildred Morrison, Paula J. Likens,
and Pamela Willig, Appellants,

v.

KUBOTA TRACTOR CORPORATION,
Respondent.

No. WD 48515.

Missouri Court of Appeals,
Western District.

Nov. 1, 1994.

As Modified Dec. 27, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 27, 1994.

Application to Transfer Denied
Feb. 21, 1995.

Steven W. White, Independence, for appellants.

Thomas R. Larson, Kansas City, for respondent.

Before HANNA, P.J., and BRECKENRIDGE and ELLIS, JJ.

ELLIS, Judge.

David Morrison was killed August 9, 1989 when his four-wheel model L–235 DT utility tractor, manufactured by Kubota Tractor Corporation ("Kubota") and sold to him by O'Dell Tractor Company, Inc. ("O'Dell"), apparently rolled over on top of him as he was mowing the inside slope of a dam on a farm pond in rural Jackson County. He was survived by his parents, Clifton and Mildred

Morrison, his wife, E. Jeanne Morrison, and two children, Paula J. Likens and Pamela Willig ("the Morrisons"). They sued for wrongful death on theories of negligence and strict liability, claiming that the tractor was defective and unreasonably dangerous both when originally manufactured and sold by Kubota and when resold by O'Dell[1] because it was not equipped with a Roll Over Protection System ("ROPS"), which is a roll bar and seat belt or harness combination designed to prevent a tractor from rolling more than 90 degrees and to keep the tractor operator restrained within a protective envelope in the event of a roll over.

Morrison was not the first owner of the tractor, which was originally manufactured and sold by Kubota in 1982. At that time, Kubota had a "delete option" program whereby ROPS would be installed as standard equipment and included in the base price of the L-235 DT unless the purchaser chose to delete it and receive a discount from the base price. If the customer wished to delete ROPS, he was required to sign a written "ROPS waiver" form provided to the dealer by Kubota attesting that he voluntarily declined to purchase ROPS after being advised of its availability and safety benefits. There was no evidence whether the original retail purchaser of the tractor involved in this case signed a ROPS waiver or chose to participate in the "delete option" program.

In the spring of 1985, the American Society of Agricultural Engineers (ASAE) adopted a standard requiring all new wheeled agricultural tractors to be sold with ROPS. Shortly thereafter, on June 1, 1985, Kubota made ROPS mandatory on its new L-235 DT tractors and the "delete option" was prohibited unless the purchaser signed a ROPS waiver and certified that the tractor would be used *exclusively* in an orchard or other low-clearance work environment where the ROPS roll bar assembly would be impractical or create additional hazards for the operator by catching on overhead objects.

Morrison's Kubota model L-235 DT tractor, which he bought used from O'Dell in November, 1987, was equipped with a front-end loader and a brush hog, but no ROPS. Just before the accident, to which there were no eyewitnesses, Morrison was mowing the inside slope of the dam with the brush hog along lines parallel to the top of the dam. A surveyor testified that the slope on the inside surface of the dam being mowed ranged from eight to twenty-seven degrees depending on location. One witness characterized the area as a "steep embankment." Morrison's owner's manual warned users of the tractor to "[s]tay off hills and slopes too steep for safe operation." The Morrisons' engineering experts testified that if it had been equipped with a ROPS, the side roll would have been limited to 90 degrees and Morrison's tractor would not have turned upside down on him. They also introduced expert testimony that although it was not unstable, the absence of ROPS made the tractor defective and unreasonably dangerous when put to a reasonably anticipated use. Kubota countered with expert testimony to the effect that although a ROPS would likely have limited the roll to 90 degrees, the tractor was not defective and unreasonably dangerous when put to a reasonably anticipated use and that Morrison was operating the tractor while roped into the driver's seat on too steep a slope and at too great a speed. The Morrison's expert estimated that the proper mowing speed in the steeply sloped area being mowed by Morrison was approximately 1 to 3 miles per hour. However, there was testimony that Morrison was mowing at a speed of approximately 5 to 7 miles per hour with the front-end loader bucket in the up position, further raising the center of gravity and increasing the risk of a roll over.

There was conflicting testimony as to whether Morrison was secured in his seat by a rope when the tractor was lifted off his body by a tow truck.[2] One paramedic pres-

1. O'Dell is not a party to this appeal as it settled with the Morrisons for $125,000 prior to the end of the trial.

2. Morrison's L-235 DT was not equipped with a rope at the time of manufacture. Clearly, roping one's self into the operator's seat on a tractor not

equipped with a ROPS would be extremely dangerous in the event of a roll over. *See Turney v. Ford Motor Co.*, 94 Ill.App.3d 678, 50 Ill.Dec. 85, 418 N.E.2d 1079, 1082 (1981). There was testimony to this effect, and the owner's manual provided to Morrison expressly stated that the

ent testified that although he couldn't see exactly what it was that restrained him, Morrison appeared to be held in his seat by something. The tow truck operator and the captain of the local fire protection district testified that Morrison was tied to the seat by a rope when the tractor was lifted off the ground and had to be cut loose. Another wrecker operator who arrived at the scene a little later said that when he got there, he heard people "asking for a pocket knife or something to cut the rope." The presence of a rope was not mentioned in their written reports. Other witnesses told a different story. Two paramedics who left the scene before the tractor was actually removed from Morrison's body saw no evidence Morrison was restrained by a rope. A deputy who investigated the accident for the Jackson County Sheriff's Department and watched the tow truck pull the tractor off the ground testified there was no rope holding Morrison's body in the seat. The acting medical examiner's report said nothing about a rope, and a neighbor testified that when the tractor was lifted off Morrison's body, he saw no evidence of his being tied to the seat.

At the close of all the evidence, the trial court directed a verdict for Kubota on the Morrisons' two negligence claims, saying, after hearing arguments from the parties' attorneys: "I don't think there was a duty. A legal duty."[3] Those claims, both of which arose from Count I of the Morrison's petition, were based on Kubota's failure to install a ROPS at the time of the tractor's manufacture and initial sale and its subsequent failure to retrofit the tractor with a ROPS following its original sale. The question of strict liability was submitted to the jury, which returned a verdict finding Morrison 100% at fault. When their motion for new trial was denied after a hearing, the Morrisons brought this appeal. We affirm the judgment of the trial court.

In Missouri, a products liability case can be based on strict liability, breach of warranty, or negligence. For products liability to be founded in negligence, the plaintiff must prove the existence of a duty, the defendant's breach thereof, and proximately caused damages. *Commercial Distribution Ctr., Inc. v. St. Regis Paper Co.*, 689 S.W.2d 664, 671 (Mo.App.1985). In a negligence action, whether a duty exists is entirely a question of law for the court. *Strickland v. Taco Bell Corp.*, 849 S.W.2d 127, 131–32 (Mo.App. 1993); *Aaron v. Havens*, 758 S.W.2d 446, 447 (Mo. banc 1988).

In their first point, the Morrisons argue the trial court erred in directing a verdict in favor of Kubota on their claim alleging that Kubota negligently failed to install a ROPS on Morrison's tractor when it was originally manufactured. We disagree.

Research has revealed only four Missouri products liability cases involving ROPS, none of which are particularly helpful in resolving this issue. *See Limbocker v. Ford Motor Co.*, 619 S.W.2d 757 (Mo.App.1981); *Strang v. Deere & Co.*, 796 S.W.2d 908 (Mo.App. 1990); *Siebern v. Missouri–Illinois Tractor & Equip. Co.*, 711 S.W.2d 935 (Mo.App.1986); and *Goff v. Schlegel*, 748 S.W.2d 813 (Mo. App.1988). This is not to say, however, that Missouri case law provides no guidance in resolving this issue. In *Stevens v. Durbin–Durco, Inc.*, 377 S.W.2d 343 (Mo.1964), a negligence action, the plaintiff was seriously injured when the handle of a "load binder," which is a device used to take the slack out of a chain securing a load on a trailer, "kicked back" and struck him in the face. At the conclusion of the plaintiff's case, the trial court sustained a motion for directed verdict made by the defendant, who manufactured the load binder. 377 S.W.2d at 344.

operator should "[n]ever use [a] seat belt when the tractor is not equipped with a ROPS."

**3.** In their brief, the Morrisons question whether the trial court had authority to enter a directed verdict for Kubota on their negligence claims "without having been asked to do so by motion." This argument has no merit. To begin with, the transcript of Kubota's oral motion for a directed

verdict at the close of all the evidence shows that Kubota requested a directed verdict on "any negligence claim" which had been asserted against Kubota in that the Morrisons had "failed to show any duty to this plaintiff." Furthermore, a trial judge may direct a verdict *sua sponte*. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 766–67 (Mo. banc 1984).

The plaintiff had alleged that the defendant negligently failed to equip the load binder with a safety ratchet device to prevent it from "kicking back," or suddenly springing open when the force on the binder was dissipated or no longer applied to the end of the handle on the binder. He further alleged that such a device could have been reasonably and effectively employed on the load binder, and that use of the safety ratchet would have prevented the "cheater" or extension pipe attached to the binder handle from flying around and hitting him in the face. *Id.* at 345–46. Finally, he claimed that the manufacturer was "obligated to exercise ordinary care to eliminate the danger before exposing a user of its product to [the] risk [of a "kick back"], where the manufacturer had 'knowledge of some potential danger.' " *Id.* at 346.

Our Supreme Court affirmed the trial court's entry of a directed verdict in favor of the manufacturer, holding that the plaintiff "failed to show the existence or breach of any duty owed" him. *Id.* at 348. The Court began its analysis by stating that the manufacturer of a product which is potentially dangerous when used in its intended fashion, or reasonably certain to place life and limb in peril when negligently constructed, is under a duty to the user to exercise ordinary care in its manufacture, and is liable to a user injured thereby if the injury results from a latent defect bespeaking lack of ordinary care in producing the product. *Id.* at 346. It continued by saying that while the manufacturer could be held liable if the defect or danger was latent or concealed, it was *not* liable "where the danger is open, obvious and apparent, or the user has actual knowledge of the defect or danger." *Id.* at 347.

In particular, the Court specifically rejected the plaintiff's argument that the rule it had just announced did not apply to the case because the plaintiff had alleged that the manufacturer should have equipped the load binder with a safety ratchet to prevent "kick backs":

A manufacturer is not obliged to adopt only those features which represent the ultimate in safety or design. A manufacturer is not under any duty "to provide a guard or other protective device to prevent injury from a patent peril or a source manifestly dangerous." [W]here the product is free of latent defects and concealed dangers; where the perilous nature of the product and the danger of using it is obvious and not concealed; where its normal functioning creates no danger not known or appreciated by the user; where it is properly manufactured to accomplish the function for which it is designed, the manufacturer has "satisfied the law's demands" and is under no duty to make it "more" safe by providing a built-in safety device.

*Id.* at 348 (internal citations omitted).

Applying these principles, the Court noted that the load binder was structurally sound, did not break down, disintegrate, crack, or fail, had functioned properly for its intended purpose, and created no danger unknown to the plaintiff, an experienced user of the product. It also observed that the "perilous nature of the product was obvious and apparent to plaintiff [and] its lack of a safety ratchet was plain to be seen." *Id.* at 348. Since the load binder complied with "[t]he full measure of the defendant's duty," which "was to manufacture a load binder structurally sound and free from any latent defect or concealed danger," the Court concluded, the plaintiff could not recover *as a matter of law*. *Id.* See also *Ward v. Hobart Mfg. Co.*, 450 F.2d 1176, 1180 & n. 9 (5th Cir.1971) (citing *Stevens* as representative of the "general rule" in negligent design cases).

*Stevens* has subsequently been applied in two Missouri products liability cases involving negligence claims: *Edwards v. Springfield Coca–Cola Bottling Co.*, 495 S.W.2d 489 (Mo.App.1973) and *Kerber v. American Mach. & Foundry Co.*, 300 F.Supp. 1205 (W.D.Mo.1968), *aff'd*, 411 F.2d 419 (8th Cir. 1969) (applying Missouri law). *Edwards* was a negligent design case brought by a supermarket customer who was injured when a soft drink bottle lying on the floor in front of a soft drink display case exploded. Affirming a directed verdict for the designer of the display case, the court held, *inter alia*, that the case's alleged unsuitability for storage of single bottles of soft drink was not a "latent defect" as contemplated in *Stevens* as it "nec-

# 427

essarily would have been discoverable by the instant plaintiff in the exercise of 'due care' or 'reasonable diligence.'" *Edwards,* 495 S.W.2d at 497.[4]

In *Kerber,* the plaintiff, a bakery employee, was injured when he reached through an opening in a bun-making machine to remove excess dough from the cup of a baking pan and his hand was mangled by the exposed chains and sprockets inside the machine's temporarily uncovered drive mechanism. Entering a directed verdict in favor of the machine's manufacturer, the trial court rejected the plaintiff's argument that the manufacturer had a duty to install various safety devices which could have prevented the injury, such as an emergency power cutoff switch near the opening or a mechanism which would render the machine inoperative when the shield covering the chains and sprockets of the conveyor was removed for maintenance. Following *Stevens,* the court said the machine functioned for the purpose for which it was designed and had no latent defect or concealed danger, that the danger of the exposed, unshielded parts was obvious, that the plaintiff was aware of the danger of sticking his hand into the place where it was injured, and that under the circumstances the manufacturer could not be held to have a duty to make the machine safer by installing the additional safety devices urged by the plaintiff. *Kerber,* 300 F.Supp. at 1206–07; *see also* 411 F.2d at 421–22. And, courts in other jurisdictions applying the "open and obvious" rule have concluded that, *as a matter of law,* an equipment manufacturer has no duty to equip its tractors, bulldozers, forklifts or earthmovers with protective structures such as a ROPS. *See, e.g., Landrum v. Massey–Ferguson, Inc.,* 473 F.2d 543 (5th Cir.1973) (applying Mississippi law); *Gates v. Ford Motor Co.,* 494 F.2d 458 (10th Cir.1974) (Oklahoma law); *Stodghill v. Fiat–Allis Constr. Mach., Inc.,* 163 Ga.App. 811, 295 S.E.2d 183 (1982); *Posey v. Clark Equip.*

*Co.,* 409 F.2d 560 (7th Cir.) (Indiana law), *cert. denied,* 396 U.S. 940, 90 S.Ct. 374, 24 L.Ed.2d 242 (1969); *Orfield v. International Harvester Co.,* 415 F.Supp. 404 (E.D.Tenn. 1975), *aff'd,* 535 F.2d 959 (6th Cir.1976) (Tennessee law); *Vineyard v. Empire Mach. Co.,* 119 Ariz. 502, 581 P.2d 1152 (1978); *Murphy v. Eaton, Yale & Towne, Inc.,* 444 F.2d 317 (6th Cir.1971) (Michigan law). *See also Pressley v. Sears–Roebuck & Co.,* 738 F.2d 1222 (11th Cir.1984) (Georgia law) ("deadman switch" on riding lawn mower); *Kolstad v. Ghidotty,* 212 Cal.App.2d 228, 28 Cal.Rptr. 123 (Ct.App.1963) (blade guards on sawmill).

The record conclusively demonstrates that Morrison, an experienced tractor operator and farmer who had driven tractors for some 40 years, was cognizant of the existence and purpose of a ROPS. He had previously ridden in a ROPS-equipped tractor, and at the time of the accident owned a bulldozer equipped with a ROPS. The L–235 DT tractor manual provided to Morrison at the time of purchase depicted thirteen tractors, all equipped with a ROPS, and recommended a ROPS for most applications. The brush hog being used by Morrison at the time of the accident had a warning sticker recommending that the tractor pulling it be equipped with a ROPS. Moreover, Morrison must have had actual knowledge that the tractor he was operating lacked a ROPS, because the absence of a ROPS is something open and obvious which is readily revealed merely by looking at a tractor. Furthermore, he had operated the ROPS-less tractor before and had been taught by his father to be careful when operating tractors without ROPS on a hillside because they can roll over, seriously injuring or killing the driver.

If the absence of a ROPS is to be regarded as a design defect, it is a defect that is patent beyond doubt. Such an open and obvious lack of this safety feature on the tractor purchased and operated by Morrison at the

---

4. Thus, the question is not whether the plaintiff was actually aware of the defect or danger but whether it was sufficiently evident that a reasonable person in the plaintiff's position would have been aware of it. "[W]here the danger is open, obvious and apparent, *or* the user has actual knowledge of the defect or danger, there is no liability on the manufacturer." *Stevens,* 377

S.W.2d at 347 (emphasis added). *See also Coleman v. Buehner,* 444 S.W.2d 16, 22 (Mo.App. 1969) (defendant has no duty to warn against risk of harm if plaintiff has actual knowledge of the dangers or if the dangerous condition of a product is open and obvious and should have been observed by the plaintiff in the exercise of ordinary care).

time of his death is not actionable under the negligence law of Missouri as declared by our Supreme Court. Therefore, applying *Stevens* and following the other cases cited *supra*, we hold that under the circumstances of this case, Kubota owed Morrison no duty to guard against the patent peril of injury in a roll over accident involving his ROPS-less tractor by installing a ROPS on his model L–235 DT utility tractor at the time of its manufacture. The trial court therefore properly directed a verdict against the Morrisons on that claim.[5]

■ Moreover, even if the Morrisons are correct that there was such a duty, we hold Kubota fulfilled it when its agent O'Dell made Morrison aware ROPS was available for purchase as an option on the L–235 DT tractor he bought. In *Biss v. Tenneco, Inc.*, 64 A.D.2d 204, 409 N.Y.S.2d 874 (1978), the plaintiff's decedent was fatally injured while operating a loader in the course of his employment. The plaintiff brought suit against the manufacturer of the loader, claiming it was defectively designed because it lacked a ROPS. It was undisputed that the ROPS was available for purchase by the decedent's employer when he purchased the loader. The trial court dismissed the complaint at the conclusion of the plaintiff's case. The appellate court affirmed, holding that the dismissal was proper because the manufacturer "fulfilled [its] duty to exercise reasonable skill and care in designing the product *as a matter of law* when [it] advised the purchaser that an appropriate safety structure for the loader was available." *Id.* 409 N.Y.S.2d at 876 (emphasis added). The court reasoned that since the loader was stable when operated properly and the danger of injury from a roll over depended on the characteristics of the work site and the

particular job being performed by the user, the duty to exercise reasonable care in selecting safety options appropriate to the loader's intended use rested with its purchaser and the manufacturer could not be held liable for failing to provide a ROPS as standard equipment. As the court said:

> If knowledge of available safety options is brought home to the purchaser, the duty to exercise reasonable care in selecting those appropriate to the intended use rests upon him. He is the party in the best position to exercise an intelligent judgment to make the trade-off between cost and function, and it is he who should bear the responsibility if the decision on optional safety equipment presents an unreasonable risk to users.

*Id.* 409 N.Y.S.2d at 876–77.

We find the reasoning in *Biss* persuasive as applied to this case, as have other courts deciding similar cases where ROPS was offered as an option on a manufacturer's tractors and forklifts. *See, e.g., Wagner v. International Harvester Co.*, 611 F.2d 224, 231 (8th Cir.1979) (applying Minnesota law) ("[T]he purchaser may be in the best position to make the cost-benefit analysis implicit in the principles of general negligence"); *Butler v. Navistar Int'l Transp. Corp.*, 809 F.Supp. 1202 (W.D.Va.1991) (Virginia law); *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324 (Colo. Ct.App.1985); *Beron v. Kramer–Trenton Co.*, 402 F.Supp. 1268 (E.D.Pa.1975), *aff'd*, 538 F.2d 318 (3d Cir.1976) (Pennsylvania law). *See also Scallan v. Duriron Co., Inc.*, 11 F.3d 1249 (5th Cir.1994) (Louisiana law) (automatic sensing annunciator on pump).

In the case at bar, Kubota showed it made substantial efforts to make purchasers of its

---

5. Due to the nature of the jury's verdict in this case, we need not decide whether the open and obvious nature of the peril posed by the absence of a safety feature such as a ROPS on a given product may justify a directed verdict in a products liability case brought on a *strict liability* theory after Missouri's adoption (by statute) of comparative fault in such cases. *Compare Philmon v. Baum*, 865 S.W.2d 771, 777 (Mo.App. 1993) (citations, internal quotation marks and brackets omitted) ("Although not conclusive, the obviousness of a defect or danger is material to the issue whether a product is unreasonably dangerous.") *with Pree v. Brunswick Corp.*, 983 F.2d 863, 867–68 (8th Cir.) (applying Missouri law), *cert. denied*, —— U.S. ——, 114 S.Ct. 65, 126 L.Ed.2d 35 (1993) (holding that manufacturer of pleasure boat engine was entitled to a directed verdict in a strict liability action brought by a boater injured when he fell into the water and was mangled by the boat's unguarded rotating propeller blades since the danger they posed was so " 'patent and obvious' " that the propellers were not unreasonably dangerous *as a matter of law*).

tractors aware of the availability and potential safety benefits of a ROPS. The manual provided to Morrison by O'Dell at the time of sale clearly recommended its use. When he bought the tractor, all the new tractors displayed in the O'Dell showroom had a ROPS on them per Kubota policy, ROPS had been standard equipment on Kubota's new tractors for over two years, and ROPS kits were available for sale to used tractor owners and purchasers at a reasonable cost.[6] Moreover, it was Kubota's corporate policy to encourage the sale of ROPS on its tractors. In fact, Kubota issued a bulletin to all its division and regional sales managers urging them "to offer and sell ROPS to every customer who purchases a Kubota tractor" and telling them they "must be diligent in [their] efforts to get customers to buy ROPS or at the very least to [offer] ROPS and all the advantages of ROPS at the time [of] purchase." Kubota also issued a notice to all its dealers explaining that it was "of the utmost importance that you and your salesmen discuss the significance and availability of ROPS with each customer." Furthermore, while the salesman who handled the sale to Morrison couldn't recall the specific details of their conversation, which had occurred some six years prior to trial, he testified that he customarily explained the availability and safety benefits of ROPS to all his customers, and had no reason to believe he had deviated from this practice in the sale to Morrison.

"In cases such as this, it is the purchaser who best can make the decision [to buy optional safety equipment] and he should bear the loss which results from his failure to do so." *Biss*, 409 N.Y.S.2d at 877. Because Kubota had no duty to install a ROPS in the first place and fulfilled any duty it might have had by offering one as optional equipment on the tractor purchased by Morrison, the trial court correctly directed a verdict for Kubota on the negligence claim predicated on that theory.

■ In their second point, the Morrisons argue the trial court erred in directing a verdict in favor of Kubota on their claim that Kubota breached its duty of care in failing to retrofit the tractor with ROPS after its initial sale. Once again, we disagree.

The parties have not cited, and we have been unable to locate any Missouri authority on the question of whether a manufacturer owes subsequent purchasers of its products a legal duty to retrofit the products with additional safety devices not required at the time of manufacture. However, Kubota does cite a case in which a panel of the Eighth Circuit Court of Appeals, applying Missouri law, answered that question in the negative. In *Wallace v. Dorsey Trailers Southeast, Inc.*, 849 F.2d 341 (8th Cir.1988), the relatives of a worker who was electrocuted while operating an aerial bucket lift brought a wrongful death suit against the corporation that purchased the assets of the lift's original manufacturer, claiming, *inter alia*, that the successor corporation had a duty to retrofit the bucket lift with electrical safety features. The district court held there was no such duty absent a state or federal law mandating a recall of the product and granted summary judgment in favor of the successor company, holding that it "was not negligent, *as a matter of law*, in failing to retrofit the allegedly defective aerial bucket lift." 849 F.2d at 344 (emphasis added). On appeal, the relatives conceded that existing Missouri law did not impose a duty to retrofit, but argued that "the Missouri courts, if given the opportunity, would recognize failure to retrofit as a submissible legal theory of negligence." *Id.* The Eighth Circuit disagreed, explaining that because it had determined that the district court had not misinterpreted Missouri law in reaching its decision, it would defer to its judgment that Missouri would not impose a duty to retrofit. *Id.* Other courts considering similar questions involving other types of machines have reached the same conclusion as to the lack of a post-sale duty to retrofit. *See, e.g., Davis v. Globe Mach. Mfg. Co.*, 102 Wash.2d 68, 684 P.2d 692 (1984); *Burke v. Deere & Co.*, 6 F.3d 497 (8th Cir.1993) (applying Iowa law), *cert. denied,* — U.S. —, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994); *Habecker v. Copperloy Corp.*, 893 F.2d 49 (3d Cir.1990) (Pennsylvania law); *Lynch v.*

6. The Morrisons' expert agreed that the price of the ROPS kits offered by Kubota was reasonable and that it was proper for Kubota to charge buyers for them.

*McStome & Lincoln Plaza Associates,* 378 Pa.Super. 430, 548 A.2d 1276 (1988). In particular, *see Romero v. International Harvester Co.,* 979 F.2d 1444 (10th Cir.1992) (Colorado law) (rejecting plaintiff's negligent·failure to retrofit claim and holding that farm equipment manufacturer had no duty to retrofit its tractors with a ROPS where they were nondefective under government and industry tractor safety standards in effect when they were originally manufactured);[7] *Butler v. Navistar Int'l Transp. Corp.,* 809 F.Supp. 1202 (W.D.Va.1991) (Virginia law) (entering summary judgment for tractor manufacturer on plaintiff's claim that manufacturer had a post-sale duty to retrofit its tractors with a ROPS).

As Kubota notes in its brief, if there is a duty to retrofit as claimed by the Morrisons, "any safety improvement would then charge a manufacturer with a duty to go out and retrofit and update all products which it had ever sold in its past history." This argument has particular merit where, as here, the plaintiff's decedent knew of the existence of ROPS when he purchased the tractor but declined to purchase one and the absence of a ROPS was plain to see. We are unwilling to say that there can never be a duty on a manufacturer to retrofit its products. However, we do hold that a tractor manufacturer, under circumstances such as presented in this case, has no post-sale duty to retrofit its tractors with a ROPS.

■ Citing the *Restatement (Second) of Torts* § 323 (1965)[8] and several Missouri cases applying that section, the Morrisons also claim that even if Missouri law imposes

no duty to retrofit, Kubota is still liable in that it voluntarily assumed such a duty by announcing a retrofit program which it then negligently failed to carry out. The Morrisons did show that in November, 1984, Kubota announced, in an internal corporate document, its intent to begin "some campaign" for the installation of a ROPS on tractors in the field and in dealer inventory "as soon as preparation time is complete." This was followed by an April, 1985 memo to all Kubota dealers mentioning a forthcoming "special sales program" to encourage the installation of ROPS on such tractors. However, these plans apparently never came to fruition. No written policy or procedure was ever developed for the nascent field retrofit program and as stated by the Morrisons in their reply brief, "the [retrofit] program never materialized." *Cf. Lockley v. Deere & Co.,* 933 F.2d 1378 (8th Cir.1991) (applying Arkansas law) (combine manufacturer *announced and carried out* an extensive field modification program in which original-design combines were retrofitted with a newly-designed cleanout door); *Burke v. Deere & Co.,* 780 F.Supp. 1225 (S.D.Iowa 1991) (applying Iowa law; same program), *rev'd,* 6 F.3d 497 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994). Having assumed a duty to retrofit its tractors in the field, the Morrisons reason, Kubota is now liable under § 323 for its negligent failure to carry out its plans.

We reject this argument. First, it is not at all clear that Kubota's actions amount to an assumption of a legally enforceable post-sale, post-manufacture duty to retrofit all its

---

7. The Morrisons' own expert admitted that in 1982, when the Kubota L–235 DT utility tractor involved in this accident was manufactured and sold at retail without a ROPS, it complied with *the applicable tractor safety standard promulgated by the ASAE* and accepted by both the American National Standards Institute (ANSI) and the Society of Automotive Engineers (SAE). As discussed *supra,* when the ASAE adopted a revised standard in 1985 requiring all new wheeled agricultural tractors to be sold with ROPS, Kubota promptly reacted by mandating that all new tractors be equipped with ROPS unless the purchaser signed a ROPS waiver and certified that the tractor would be used exclusively in a low-clearance work environment where the presence of a ROPS might increase the danger to the operator.

8. This section, entitled "Negligent Performance of Undertaking to Render Services," states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

tractors in the field. At least one court has held that a similar ROPS retrofit program instituted by Ford did not. *See Dion v. Ford Motor Co.,* 804 S.W.2d 302, 309–10 (Tex.Ct. App.1991). Second, this theory of negligence was never pleaded as a basis for recovery by the Morrisons. Third, the evidence adduced at trial by the Morrisons does not satisfy either condition specified in § 323. Kubota's failure to carry out its plan to retrofit the tractors did not "increase the risk" of harm to Morrison—it remained the same as it was before the gratuitous undertaking was announced. Moreover, there was no showing that Morrison relied in any way upon Kubota's internal announcement that it was planning to implement a retrofit program or that Morrison even knew of it. Fourth, the Morrisons fail to recognize that the text of § 323 contains the following caveat:

> Caveat: The Institute expresses no opinion as to whether: (1) the making of a contract, or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section,

> \* \* \* \* \* \*

> **Comment on Caveat:**

> d. Promise as an undertaking. The Caveat leaves open the question whether a mere promise, without in any way entering upon performance, is an undertaking sufficient to make the promisor liable under the rule stated in this Section.

Missouri courts addressing the issue raised in the caveat have held that there is no liability in the absence of some allegation and proof that the gratuitous promisor actually entered upon performance of the promise. *See Miller v. Bennett,* 237 Mo.App. 1285, 172 S.W.2d 960 (1943); *State ex rel. Badami v. Gaertner,* 630 S.W.2d 175 (Mo.App. banc 1982). As stated by the court in *Badami,* "[s]omething more" than a mere general failure to fulfill an allegedly assumed duty must be pleaded and proven at trial for there to be actionable negligence under the Restatement. 630 S.W.2d at 180. *See also Cash v. Benward,* 873 S.W.2d 913, 917 (Mo.App.1994) (to constitute a legal basis for a claim of negligence under § 323, the undertaking

"must be more than a promise or failure to perform.") Point denied.

To conclude, the trial court did not err in finding there was no duty to retrofit the tractor with a ROPS. Moreover, even if Kubota had gratuitously assumed such a duty, the Morrisons failed to prove that Kubota was liable to them for negligently conducting its retrofit program. Therefore, a directed verdict on that negligence claim was proper.

■ In their third point, the Morrisons contend the trial court erred in giving Instruction No. 8 on comparative fault submitted by Kubota because the instruction impermissibly deviated from MAI 32.23. We cannot agree. The jury's determination that Kubota was zero percent at fault renders harmless any error in the giving of the comparative fault instruction. Furthermore, it would have been error to give MAI 32.23 in this case.

We first set forth the text of the relevant instructions. Instruction No. 6, the defective product verdict directing instruction, reads as follows:

> On the claim of the survivors of David Eldo Morrison for damages for wrongful death based on product defect against Kubota Tractor Corporation, you must assess a percentage of fault to defendant Kubota Tractor Corporation whether or not David Eldo Morrison was partly at fault if you believe:

> **First,** defendant Kubota Tractor Corporation sold the Kubota L235 DT tractor without ROPS in the course of defendant's business, and

> **Second,** the Kubota L235 DT tractor was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

> **Third,** the Kubota L235 DT tractor was used in the manner reasonably anticipated, and

> **Fourth,** such defective condition as existed when the Kubota L235 DT tractor was sold, directly caused or directly contributed to cause the death of David Eldo Morrison.

Here is the text of Instruction No. 8, the comparative fault instruction about which the Morrisons are complaining:

> In your verdict, you must assess a percentage of fault to David Eldo Morrison, whether or not you assess a percentage of fault to defendant, Kubota Tractor Corporation, if you believe:
>
> **First,** when the tractor was used, David Eldo Morrison either:
>
> mowed sideways on a slope which was too steep for safe operation, or
>
> operated the tractor at an excessive rate of speed under the circumstances, or
>
> tied himself in the seat without ROPS, or
>
> had knowingly failed to purchase and use ROPS, and
>
> **Second,** David Eldo Morrison thereby failed to undertake the precautions a reasonably careful user of the tractor would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances, and
>
> **Third,** such conduct directly caused or directly contributed to cause David Eldo Morrison's death.

It is apparent from these instructions that any claimed error in the giving of Instruction No. 8 was harmless because the jury assessed zero percent fault to Kubota. *Schaedler v. Rockwell Graphic Systems, Inc.,* 817 S.W.2d 499 (Mo.App.1991). *Schaedler* was a products liability case in which the court gave a strict liability instruction based on MAI 25.04 (Verdict Directing—Strict Liability—Product Defect) and a comparative fault instruction based on MAI 37.02 (Comparative Fault—Required Change of Former Contributory Negligence Instruction to Submit Plaintiff's Comparative Fault), modified to submit the plaintiff's comparative fault under one of the defenses established by § 537.765, RSMo Supp.1990. 817 S.W.2d at 500–01. The jury returned a verdict assessing no fault to the defendants, and the plaintiff argued on appeal that the comparative fault instruction was erroneous. This court refused to consider the claim of instructional error since the plaintiff had failed to show

prejudice, holding that any error in submitting the instruction was harmless in that the jury assessed no fault to the defendants:

> The court must assume that the jury followed the instructions and, applying the rationale of *Shanks* [*Wilson v. Shanks,* 785 S.W.2d 282 (Mo. banc 1990) ], when the jury in this case decided the defendants were not liable under the verdict directing instruction, the jury was not required to consider [the plaintiff's] conduct under the comparative fault instruction. Thus, the comparative fault instruction cannot have prejudiced [the defendants].

*Schaedler,* 817 S.W.2d at 501. We then rejected the plaintiff's various arguments, revived by the Morrisons in their brief in a slightly different form, that this "no prejudice" rule should not apply in strict liability cases involving comparative fault instructions. *Id.* at 501–03; *see also Schisler v. Rotex Punch Co.,* 746 S.W.2d 592 (Mo.App. 1988).

Under Instruction No. 6, which was also based on MAI 25.04, the jury was instructed that it *must* assess a percentage of fault to Kubota if the tractor was defective and unreasonably dangerous regardless of any fault attributable to Morrison. By assessing 0% of the fault to Kubota, the jury stated that the tractor was either non-defective, not used in a reasonably anticipated manner, or that any defect was not the proximate cause of Morrison's death. Either way, the exact wording of the comparative fault instruction, Instruction No. 8, became irrelevant.

Attempting to save their claim of instructional error, the Morrisons also argue that the appropriate pattern instruction for comparative fault in this strict liability case was MAI 32.23 (Affirmative Defenses—Product Liability—Strict Liability—Contributory Fault) as modified by MAI 37.01 (Comparative Fault—Verdict Directing Modification). Since Kubota did not use a mandatory MAI instruction where one existed, they argue, reversal is required as the failure to use such an instruction is presumed to be prejudicial. This argument is devoid of merit. MAI 32.23 is an instruction used in strict liability cases where the defendant presents sufficient evi-

dence at trial on the complete affirmative defense of contributory fault. Section 537.765, RSMo Supp.1989, abolished contributory fault as a complete defense in products liability cases in favor of a system of comparative fault apportionment for strict liability causes of action accruing after July 1, 1987. *See Egelhoff v. Holt,* 875 S.W.2d 543, 547 (Mo. banc 1994). Since the Morrisons' strict liability claim accrued after that date, it would have been error for the trial court to have given MAI 32.23. As explained in the 1991 Committee Comment to MAI 32.23, in cases where § 537.765 is applicable, comparative fault is to be submitted using an instruction from Chapter 37.00. *Missouri Approved Jury Instructions* 32.23, at 455 (4th ed. 1991). Furthermore, even if MAI 32.23 was the correct instruction, modifying it with MAI 37.01 would have been error since MAI 37.01 is only to be used to modify the *plaintiff's* verdict director, not the *defendant's* comparative fault instruction. The proper modifying instruction was MAI 37.02 (Comparative Fault—Required Change of Former Contributory Negligence Instruction to Submit Plaintiff's Comparative Fault). In this case, however, MAI 37.02 was not appropriate since Kubota wished to submit multiple acts by Morrison constituting comparative fault as defined in § 537.765.3(5).[9] Thus, following the Notes on Use for MAI 37.02, Kubota patterned Instruction No. 8 after MAI 32.01(2) (Comparative Fault—Multiple Negligent Acts Submitted) with appropriate modifications to reflect the specific conduct by Morrison that was claimed to constitute the fault under § 537.765.3(5). *See Missouri Approved Jury Instructions* 37.02, at 630 (4th ed. 1991); *Egelhoff,* 875 S.W.2d at 547–48 (because there is no approved instruction for submitting the defenses encompassed within § 537.765.3, a defendant may submit a "Not in MAI" instruction appropriately modeled after the closest applicable MAI and the statutory language of § 537.765.3).

The first paragraph of Instruction No. 8 specifically hypothesizes each of the acts of Morrison which Kubota claimed constituted a "failure to undertake the precautions a reasonably careful user of the product would take to protect himself" under § 537.765.3(5). A disjunctive submission was required because there were several acts undertaken by Morrison which could have been "fault" on his part under the evidence adduced at trial. Since there was no applicable mandatory MAI in this case, the Morrisons' claim of prejudicial instructional error must fail. Point denied.

In their fourth and final point, the Morrisons maintain that the trial court erred in allowing witnesses Dennis Skogen and Rickie Knox to testify concerning the point at which the tractor rolled over and whether the tractor was being used in an unreasonable, unanticipated manner. This assignment of error, like the others advanced in this appeal, must be denied. Neither witness directly testified as to what point the tractor rolled over. Knox testified to matters within his personal knowledge and Skogen gave his expert opinion as to the reasonableness of Morrison's use based on facts already established.

■ In their brief, the Morrisons insist the trial court erred in admitting testimony from Knox on the issue of where the tractor rolled over. Specifically, they object to Knox being allowed to draw lines on a large sheet of paper which represented the slope of the ground where the last swath of grass was cut. They claim this sketch was an accident reconstruction which is impermissible as the jury must draw conclusions from the evi-

9. The applicable portion of § 537.765 is as follows:

2. Defendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery.

3. For purposes of this section, "fault" is limited to:

\* \* \* \* \* \*

(5) The failure to undertake the precautions a reasonably careful user of the product would take to protect himself against dangers which he would reasonably appreciate under the same or similar circumstances;

dence presented to determine the moment and place the accident occurred. *See Housman v. Fiddyment,* 421 S.W.2d 284, 292 (Mo. banc 1967) (expert witness not allowed to testify to the point of impact of two vehicles).

▮ Twice during his testimony Knox started to testify as to the point ·at which Morrison was mowing when the accident occurred. Both times the trial court sustained the Morrisons' objections on the ground that this· testimony was accident reconstruction. However, Knox, who was at the scene following the accident, was properly allowed to testify as to where he saw the last swath of mowed grass and to draw the slope of the hill at that point because this evidence was within his personal knowledge. Lay witnesses are permitted to discuss physical facts at the scene of an accident which they personally observe. *Galvan v. Cameron Mut. Ins. Co.,* 733 S.W.2d 771, 774 (Mo.App.1987). The trial court properly sustained the objections to Knox's testimony when he began to draw the conclusion for the jury. Thus, there was no error in the admission of Knox's testimony.

▮ The Morrisons next argue that the trial court erred in allowing Kubota's expert witness, Dennis Skogen, to testify that the tractor was not being used in a reasonably anticipated manner at the time it rolled over. Skogen testified as follows:

[I]n my opinion it's not reasonable to anticipate that someone would attempt to mow or drive across that slope at 29 degrees or even in that area. That's too steep a slope to be reasonably anticipated.

The Morrisons objected at the time on the ground that the testimony lacked foundation and invaded the province of the jury. On appeal, they maintain that the testimony lacked any factual basis and was without proper foundation.

Skogen was an expert. He testified that he had a master's degree in mechanical engineering and since 1970 had worked reconstructing and analyzing how accidents happened and can be prevented. Skogen testified he had analyzed over 100 roll over accidents and ten involving tractors. Skogen never examined the scene of the accident but relied on several of the exhibits to provide his testimony. These exhibits included surveys of the land (Exhibits 14 and 15), a picture of the scene (Exhibit 4) and Knox's drawing (Exhibit 87).

The Morrisons contend that other than Skogen's "bare assertion," there was no evidence the tractor overturned while being driven on a 29 degree slope. They claim that Skogen was using his own insufficiently supported opinion as to the angle as a basis for his opinion that the tractor was being operated in an unreasonable manner. This would be improper because an expert's opinion must be based on facts actually established and his opinion cannot be used to establish those facts. *Holtgrave v. Hoffman,* 716 S.W.2d 332, 335 (Mo.App.1986).

The problem with this argument is that there was a sufficient factual basis underlying Skogen's testimony. Skogen made his calculation from Exhibit 4, which showed people at the accident scene standing on the ground adjacent to the overturned tractor. Skogen compared the area with the surveyor's exhibits and determined that the area where the people were standing was most similar to an area on the surveyor's exhibit labeled EE. Skogen was then asked what angle a tractor would be at if a tractor was placed at area EE and he answered that the angle would be 29 degrees based on calculations from Exhibit 4. There was *no* objection to this testimony. The Morrisons only *objected when* Skogen was asked to give an angle for a spot on Exhibit 87 (Knox's drawing) which was not drawn to scale. Thus, there was a sufficient foundation for Skogen to give his opinion on whether driving the tractor on a 29 degree slope was unreasonable. Furthermore, Skogen's testimony that it would be unreasonable for someone to mow in "even in that [general] area" was unchallenged. Point denied.

The judgment of the trial court is affirmed in all respects.

All concur.