# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3855

_____

Sammie Sappington; Evelyn
Sappington; Justin Sappington,

      Plaintiffs - Appellants,

      v.

Skyjack, Inc., A Division of Linamar
Corp., A Canadian Corporation; Rental
Services Corporation, Inc.,

      Defendants - Appellees.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the Western
District of Missouri.

_____

Submitted: October 15, 2007
Filed: January 4, 2008

_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

      Sammie Sappington, Evelyn Sappington, and Justin Sappington (plaintiffs) appeal the district court's order excluding the testimony of their retained experts and granting summary judgment in favor of Skyjack, Inc., and Rental Services Corporation, Inc. (RSC). We reverse.

This strict products liability action arises out of the death of Doyle Sappington, a carpenter employed by a general contractor performing work on a parking garage construction project in Kansas City, Missouri. On the day of the accident, Sappington was operating a scissors lift,[1] Model SJII 4626 (SJII), manufactured by Skyjack. The lift was owned by RSC and had been leased to a subcontractor on the construction project.

The Skyjack SJII, and the later manufactured Skyjack SJIII 4626 lift (SJIII), are forty-six inches wide and can be elevated to a working height of twenty-six feet. The Skyjack SJIII differs from the SJII primarily because Skyjack incorporated "pothole protection" into its design. Pothole protection is an industry term of art, referring to design features intended to enhance stability in the event a lift is driven into a depression or pothole. Pothole protection, as the phrase is used here, refers specifically to a system of drop-down stabilizing bars located at the bottom sides of the lift platform, which, when deployed, reduce the lift's ground clearance. When activated, the pothole protection design on the SJIII reduces ground clearance from 3 1/4 inches to 3/4 inches, thereby increasing stability by reducing the distance the SJIII drops if it enters a depression.

Both models have controls located on the work platform which allow the operator to raise and lower the work platform, and drive the lift forward and backward without lowering the platform. At the time of the accident, Sappington was operating the lift on a smooth concrete surface with a slope of approximately 0.07 percent, and the work platform was raised to at or near its maximum level of twenty-six feet. The

---

[1]A scissors lift is a mobile work platform commonly used on construction sites as an alternative to stationary scaffolding. It takes its name from the operating mechanism used to elevate the work platform which resembles and operates like a scissors.

accident occurred when he drove the lift in reverse and the rear wheels dropped off the concrete floor into a hole created earlier in the day when a portion of the concrete floor was removed. When the rear wheels dropped off the edge of the walkway, the lift became unstable, pitched backwards, and tipped over. Sappington fell from the lift and later died from his injuries.

Plaintiffs, (Evelyn (Doyle's mother), Sammie (Doyle's daughter), and Justin (Doyle's son)), brought a strict products liability claim against the manufacturer of the lift, Skyjack, and the lift owner/lessor, RSC.[2] Plaintiffs allege the SJII was defective and unreasonably dangerous because it was not sufficiently stable to remain upright when its wheels dropped into the hole. They contend Skyjack should not have manufactured the lift without pothole protection, and all lifts currently manufactured are so equipped, including the SJIII, the successor to the SJII. Plaintiffs argue the pothole protection technology incorporated into the design of the SJIII, manufactured two years after the SJII lift involved in the accident, was available and feasible in 1995 when the subject SJII lift was manufactured. Plaintiffs contend 1) the SJIII design would have prevented the tip-over accident, 2) the design was available at the time the SJII was manufactured, i.e., economically and technologically feasible, and 3) the safer design should have been used by Skyjack instead of the SJII design. Plaintiffs also allege RSC had both SJII and SJIII lifts available for lease and the SJII it leased to the subcontractor was defective and unreasonably dangerous.

To support their strict products liability claims, plaintiffs hired two experts. The first, Bryan Johnson, was hired to perform testing on an SJIII lift to determine whether, under conditions similar to those at the accident scene, it would remain upright. Johnson placed the SJIII on a wooden platform, sloped at approximately two degrees, which raised the lift seven inches off the road surface. He loaded the lift's

_____

[2]The original complaint alleged additional causes of action which have been dismissed and are not relevant to this appeal.

work platform with 205 pounds, raised it to its maximum height of twenty-six feet, and drove it at a top speed forward and backward until the wheels dropped off the edge of the platform. On each occasion, the lift remained upright.

The second expert, Dr. James Blundell, is an associate professor of mechanical engineering with the undergraduate mechanical engineering school at the University of Missouri, Kansas City. He holds a PhD in mechanical engineering and teaches courses in machine design and design safety. In connection with his work on the case, Dr. Blundell reviewed depositions (including testimony detailing stability testing of the SJIII conducted by Skyjack), accident scene photographs, photographs from Skyjack's post-accident investigation, reports authored by Johnson and Ken Zimmer (plaintiffs' previous expert witness), the OSHA investigation file, documents produced under seal by Skyjack, the SJII and SJIII operating manuals, American National Standards Institute (ANSI) standards A92.6-1990 and 1999 for "Self Propelled Elevating Work Platforms," and a video created by Mayville Engineering Company (MEC), entitled *Pot Hole Protection Can You Live Without It?* Dr. Blundell did not conduct independent testing, but instead relied on stability testing of the SJIII lift performed by Johnson and Skyjack.

Dr. Blundell stated the SJII operated by Sappington was defective and unreasonably dangerous because it did not remain upright when its wheels dropped into the depression. He further opined the pothole protection would have prevented the unit from overturning. Dr. Blundell concluded, based on his review of current ANSI standards, that elevated lifts are now required to withstand the instability encountered in Sappington's accident. He further stated the SJIII was technically and economically feasible when the SJII was manufactured in 1995,[3] and complies with

_____

[3]When discussing feasibility, Dr. Blundell used the term interchangeably with "state of the art." By doing so, he created some confusion because state of the art is also used to describe a defense which may be offered by a manufacturer to a claim of negligence based on products liability. By state of the art, Dr. Blundell means the

the current ANSI standard. See ANSI Standard A92.6 (American National Standard for Self-propelled Elevating Work Platforms) (promulgated 1999 and replacing ANSI Standard A92.6 promulgated 1990). In other words, according to Dr. Blundell, the SJIII could and should have replaced the SJII by 1995, and the accident would not have occurred had Sappington been using an SJIII lift.[4]

As evidence of feasibility, Dr. Blundell's report indicated other lift manufacturers, e.g., MEC, Snorkel, and Upright, recognized the need for and incorporated pothole protection into their designs before the SkyJack II involved in the accident was manufactured; in MEC's case, as early as 1987. Additionally, he identified internal Skyjack memoranda, dated beginning January 1995, discussing the need to implement pothole protection, and reflecting plans to do so as of August 1995.

After discovery, Skyjack and RSC moved to exclude the testimony of both experts, and for summary judgment, arguing that without expert testimony plaintiffs could not prove the SJII lift was defective and unreasonably dangerous. The district court, relying on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), held the experts' testimony was neither relevant or reliable and excluded the evidence. It further held plaintiffs could not prove their claims without expert testimony and granted summary judgment. On appeal, plaintiffs argue the district court abused its discretion when it excluded the expert testimony, and summary judgment was inappropriate.

---

technology was available and economically feasible.

[4]The applicable ANSI standard does not explicitly mention pothole protection. Dr. Blundell, however, testified the testing mandated by the standard requires lifts to remain stable when tested under drop off conditions. According to Dr. Blundell, to meet the standard's testing requirements, all manufacturers have incorporated pothole protection. Thus, Dr. Blundell opined the effect of the standard is to require pothole protection.

II

We review a grant of summary judgment de novo, applying the same standard as the district court. Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1085 (8th Cir. 1999). Summary judgment is proper if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When ruling on a summary judgment motion, a court must view the evidence "in the light most favorable to the nonmoving party." Dush v. Appleton Elec. Co., 124 F.3d 957, 962-63 (8th Cir. 1997) (citing F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997)). However, a "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." F.D.I.C., 106 F.3d at 263 (citing Rolscreen Co. v. Pella Prods. of St. Louis, Inc., 64 F.3d 1202, 1211 (8th Cir. 1995)).

This is a diversity action and is governed by state substantive law. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). The parties agree Missouri substantive law controls.

A

Under Missouri law,

[T]he term "products liability claim" means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and
(2) The product was used in a manner reasonably anticipated; and
(3) Either or both of the following:
(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was

damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

Mo. Rev. Stat. § 537.760.

To prove a claim of strict products liability, a Missouri plaintiff "must prove that the product was defective and dangerous when put to a reasonable use anticipated by the manufacturer and that the plaintiff sustained damage as a direct result of the defect." Peters v. Gen. Motors Corp., 200 S.W.3d 1, 17 (Mo. Ct. App. 2006) (citations omitted); see also Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 375 (Mo. 1999) (en banc) ("[T]he primary inquiry in a design defect case is whether the product – because of the way it is designed – creates an unreasonable risk of danger to the consumer or user when put to normal use.").

In Missouri, "the concept of 'unreasonable danger' is to be treated as an ultimate issue for the jury." Rodriquez v. Suzuki Motor Corp., 996 S.W.2d 47, 65 (Mo. 1999) (en banc) (citing Nesselrode, 707 S.W.2d at 378). Missouri courts have consistently refused to impose any "judicial definition [of unreasonably dangerous] whether derived from consumer expectations, risk-utility, or otherwise." Id. Instead, juries "give the concept of unreasonable danger content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." Thompson v. Brown & Williamson Tobacco Corp., 207 S.W.3d 76, 90 (Mo. Ct. App. 2006) (citations and quotations omitted). The parties are "entitled to assist the jury in defining the term 'unreasonably dangerous' by presenting evidence that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence." Id. (citations and quotations omitted).

Such evidence, however, is not required and a plaintiff is not, for example, "required to prove the existence of a reasonable alternative design in order to make a submissible case." Id. at 90-91. Further, a plaintiff has no burden to prove a product failure or malfunction, Stinson v. E.I. DuPont De Nemours and Co., 904 S.W.2d 428, 431 (Mo. Ct. App. 1995) (citation and quotations omitted), and "[t]he existence of a defect may be inferred from circumstantial evidence with or without the aid of an expert witness," Klein v. General Elec. Co., 714 S.W.2d 896, 900 (Mo. Ct. App. 1986).

For summary judgment purposes, the evidence plaintiffs offer shows the SJII lift Sappington was operating was manufactured and leased by defendants. Further, the alleged defect, i.e., the failure of the lift to remain stable during an encounter with a drop off, existed at the time the lift was manufactured and leased. Neither defendant contends the subject lift had been altered in any manner. Finally, there is no dispute Sappington's death was the direct result of injuries he sustained when the lift overturned.

Additionally, there has been no evidence offered to suggest Sappington was using the SJII lift in a manner not reasonably anticipated. Skyjack hints Sappington was at fault for the accident because he failed to observe the depression, and Sappington caused the accident when he drove the lift into the pothole. Using lifts at constructions sites, where depressions or potholes are common, does not constitute an unforeseeable misuse of the product. Furthermore, even assuming the depression constituted an open and obvious hazard, and Sappington's fault contributed to the accident, "[e]vidence that the defect was readily apparent would not bar plaintiffs' recovery, but could be properly considered in apportioning fault." Miller v. Varity Corp., 922 S.W.2d 821, 826 (Mo. Ct. App. 1996).

The defendants also suggest the absence of evidence of other accidents is fatal to plaintiffs' claims. "Evidence of the absence of other accidents has been held

-8-

relevant and admissible in a product liability case." Savant v. Lincoln Eng'g, 899 S.W.2d 120, 122 (Mo. Ct. App. 1995). A defendant offering such evidence, however, must show "no accidents occurred when the product was used under conditions substantially similar to those faced by plaintiff and that an adequate number of those situations occurred to make the absence of accidents meaningful." Id. Even assuming a lack of other accident evidence could, as a matter of law, bar plaintiffs' claims, there has been no such evidence offered in this case.

In considering defendants' arguments, the district court, relying on Morrison v. Kubota Tractor Corp., 891 S.W.2d 422 (Mo. Ct. App. 1994), noted:

> [W]here the perilous nature of the product and the danger of using it is obvious and not concealed; where its normal functioning creates no danger not known or appreciated by the user; where it is properly manufactured to accomplish the function for which it is designed, the manufacturer has satisfied the law's demands and is under no duty to make it "more" safe by providing a built-in safety device.

Dist. Ct. Order, p. 20.

Morrison, however, is inapposite, and offers no support for the district court's erroneous decision to grant summary judgment. In Morrison, the Missouri court of appeals was asked to determine whether a trial court erred in directing verdicts on plaintiffs' negligence claims. 891 S.W.2d at 427-28. The court of appeals held a manufacturer cannot be held liable under a negligent design theory when the defect or danger is open, obvious and apparent. Id. The holding of Morrison, however, was specifically limited to negligence claims. Id. at 427-28 n.5. Since Morrison, the court of appeals has confirmed the open and obvious nature of a hazard does not bar recovery by a plaintiff in a strict products liability claim, but may be considered in apportioning fault. Miller, 922 S.W.2d at 826.

The district court ultimately concluded, and the defendants assert on appeal, that plaintiffs cannot maintain a submissible claim for strict products liability without the excluded expert testimony. We disagree. A claim of strict products liability may be based solely upon circumstantial evidence and does not require expert testimony. Klein, 714 S.W.2d at 900. Moreover, a Missouri plaintiff is not required to present evidence "that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence." Thompson, 207 S.W.3d at 90. In this case, the contested issue on summary judgment is whether the lift was unreasonably dangerous, and is an issue which resides solely within the province of the jury. Rodriguez, 996 S.W.2d at 65. Plaintiffs contend Sappington was killed because the lift failed to remain upright when it encountered the depression – a common workplace hazard. According to plaintiffs, the propensity for lifts to tip over when driven into drop offs was a concern within the industry before the subject lift was manufactured. Plaintiffs have offered evidence tending to show the technology exists, and indeed existed in 1995, to manufacture more stable lifts – including a lift which would not have overturned under the conditions presented by this accident. This evidence does not require the testimony of experts, and we are not able to say, under Missouri's law of strict products liability, there is no conceivable way for plaintiffs to convince a jury the lift was unreasonably dangerous.

> It is true that manufacturers need only build "reasonably safe" [products], and that when plaintiffs fail to prove otherwise they do not make a submissible case. Nevertheless, this determination is normally made *after* plaintiff puts on evidence. Unless there is no conceivable way for plaintiff to prove the ultimate facts alleged, plaintiff should be allowed to proceed.

Threats v. Gen. Motors Corp., 890 S.W.2d 327, 329 (Mo. Ct. App. 1994) (emphasis in original) (citation omitted).

-10-

Accordingly, we determine summary judgment was improvidently granted.

B

We next consider – and reject – the district court's bases for excluding the testimony of plaintiffs' experts.

The district court's exclusion of expert testimony is reviewed for an abuse of discretion. Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702; under Rule 702 the trial judge acts as a "gatekeeper" screening evidence for relevance and reliability. Daubert, 509 U.S. at 589. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. The rule clearly is one of admissibility rather than exclusion." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

A district court should apply a three-part test when screening testimony under Rule 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

In Daubert, the Supreme Court provided a non-exhaustive list of factors a district court should consider when performing its gatekeeper function, including,

> 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted.

Lauzon, 270 F.3d at 686.

> Subsequent cases have proposed additional factors, including, whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

Id. at 686-87.

1

The district court excluded the results of Johnson's testing finding them irrelevant and unreliable. In so holding, the court relied on what it perceived to be numerous important dissimilarities between the test conditions and the accident conditions. We discuss each below.

The district court focused on the fact Johnson's testing involved the SJIII, instead of the SJII, and apparently concluded Johnson's testing would only have been relevant and reliable had it been conducted using an SJII lift retrofitted with pothole protection. The district court's reasoning on this issue, and in other portions of its order, reflects a fundamental misunderstanding of plaintiffs' theory of the case and the

-12-

arguments advanced by the plaintiffs. Plaintiffs do not argue the SJII lift should have been retrofitted with pothole protection. Instead, they contend the accident would not have happened had Sappington been operating an SJIII lift, which in 1995 was a reasonable alternative design to the SJII lift. Because plaintiffs offer the SJIII as a reasonable alternative to the SJII, testing of the SJIII is highly relevant. Assuming plaintiffs prove the SJIII design was feasible at the time the SJII was manufactured, they still must prove the SJIII would not have tipped over under conditions similar to those present at the tip-over site. While the district court viewed Johnson's tests as an attempt to reconstruct the accident using the wrong lift, Johnson performed the tests to show the proffered reasonable alternative design (the SJIII) would not have tipped under similar conditions. Thus, Johnson's testing of the SJIII is highly relevant, whereas testing on an SJII would have been irrelevant.

The district court also focused on the difference in overall weight between the SJII and the SJIII. The SJII lift is approximately 700 pounds lighter than the SJIII, giving the SJIII a lower center of gravity. Because center of gravity affects stability, the district court found the weight difference between the machines made testing of the SJIII irrelevant and unreliable. Plaintiffs do not argue an SJII lift retrofitted with pothole protection would have prevented the accident. If they did, testing on a modified SJII machine would be necessary and weight differences between the SJII and SJIII would be relevant. Instead, plaintiffs argue the SJIII lift should have replaced the SJII lift and the SJII should not have been manufactured in 1995. Once plaintiffs' theory of the case is cast in the proper light, Johnson's testing to determine the stability parameters of the SJIII becomes highly relevant, and weight differences between it and the SJII are irrelevant.

Next, the district court focused on differences between the conditions under which Johnson conducted his testing and those which existed at the accident scene. In particular, the district court found the platform off which Johnson drove the lift varied from the slope of the concrete flooring on which Sappington was driving the

-13-

lift.  Additionally, the court found Sappington was driving on concrete and Johnson tested the SJIII by driving it off a wooden platform.  Neither of these differences are relevant.

The slope at the accident scene was approximately 0.07 percent.  The slope of the platform used by Johnson was approximately two percent.  Thus, the difference was minimal.  More importantly, to the extent there was a difference, Johnson's testing involved a greater degree of slope, thereby presenting conditions more adverse than those present at the accident.  If the lift could remain stable under more adverse conditions, Johnson's testing suggests it would have remained stable during the accident.

As for the difference in surface material, i.e., concrete versus wood, the record offers no explanation for why the differences would undermine the relevance or reliability of Johnson's tests, and we will not speculate on a matter more appropriately reserved for cross examination.

The final dissimilarity noted by the district court relates to the load on the work platform at the time of the accident, compared to the load on the platform during the testing.  The parties agree the platform load at the time of the accident was approximately 305 pounds.  Johnson, however, believed the load was approximately 84 pounds less.  Thus, he did not test the SJIII under the same load conditions as were present at the time of the accident.

As the load on the work platform increases, the center of gravity changes and reduces stability.  The 84 pound difference in work platform load between the accident and the testing, however, is not sufficient in our view to render Johnson's testing inadmissible.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."  Triton Corp. v. Hardrives,

-14-

Inc., 85 F.3d 343, 347 (8th Cir. 1996) (quoting Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir.1988)).[5]

We conclude it was an abuse of discretion to exclude the results of Johnson's testing because the purported dissimilarities offered by the district court are not relevant or sufficient to render Johnson's opinions inadmissible.

2

The district court also excluded the opinions of Dr. Blundell, finding them irrelevant and unreliable. As with Johnson's opinions, the reasons articulated by the district court for excluding Dr. Blundell are considered below.

The district court noted Dr. Blundell relied on Johnson's testing to form part of the factual basis for his opinions, i.e., because the SJIII remained stable during testing it would not have tipped under the circumstances present during the accident. The district court, having mistakenly concluded Johnson's testing was designed to show the SJII would not have tipped over if retrofitted with pothole protection, concluded Dr. Brundell's opinions were based on irrelevant and unreliable information. As noted, Johnson's testing should not have been rejected and the district court erred in excluding Dr. Brundell's opinions because they rely in part on Johnson's testing.

The district court also refused to allow Dr. Blundell to rely on testing Skyjack performed on the SJIII lift. Even assuming Johnson's testing was sufficiently flawed to warrant its rejection, plaintiffs argue the stability testing conducted by Skyjack to ensure the SJIII complied with the current ANSI standard can be used to prove the

---

[5]As will be explained later, stability testing conducted by Skyjack strongly suggests the 84 pound weight difference did not significantly affect the test results.

-15-

SJIII would not have overturned in the accident.  According to plaintiffs, Skyjack drove the SJIII into a drop off 30-50 times and on every occasion it remained stable, thereby proving it would not have tipped in the accident.  The district court rejected the argument, finding the testimony from Skyjack's in-house expert did not explain under what conditions the testing was performed, i.e., height of the work platform, slope, and the amount of load on the work platform.

The deposition testimony of Skyjack's in-house expert does not include information about the height of the platform, slope, or the amount of load on the work platform during Skyjack's testing.  Skyjack, however, concedes its SJIII lift complies with the current ANSI standard and has passed the testing requirements imposed by the standard.  Therefore, as explained below, it was unnecessary for Skyjack's expert to testify about the conditions under which its testing was performed, i.e., platform height, workload, slope, etc., because those testing conditions are dictated by the ANSI standard.

The current ANSI standard requires self-propelled lifts to undergo several stability tests and to remain stable under "the most adverse stability condition(s)." ANSI Standard A92.6-1999, subpart 4.7 (Stability Testing).  Most adverse stability condition(s) is defined as

> The permitted configuration of the aerial platform most likely to cause instability while maintaining stability.  Factors to be considered shall include:
>
> 1. With zero load to *maximum test load*.
> 2. Up to and *including maximum platform height*.
> 3. All positions and configurations of the platform(s).
> 4. All wheel and axle positions.
> 5. Forward and backward configurations of the elevating assembly.

-16-

6.  All other moveable features which affect the stability of the aerial platform.

Id. at subpart 3 (Definitions) (emphasis added).

Among the stability tests required by the ANSI standard is a vertical load test to determine the forward to backward stability of the lift under "most adverse stability condition(s)." See subpart 4.7.2 (Vertical load test). This test, in addition to requiring the lift be tested at maximum platform height (26 feet), requires the work platform to be loaded at 1.50 times its rated capacity with the load placed 12 inches back from the guardrail. The rated workload for the SJIII is 850 pounds. To comply with the stability testing mandated by ANSI, the lift must remain vertically stable when fully elevated to 26 feet and carrying a load of 1275 pounds.

The standard also requires stability testing on a slope. See subpart 4.7.3 (Static load test on slope). For this test, the work platform is loaded to 1.33 times the rated workload of 850 pounds (1130.5 pounds), with the load placed 12 inches back from the guardrail, and testing is performed on a slope 5 degrees greater than the slope for which the lift is rated by the manufacturer. The record indicates the accident happened at 0.07 percent slope and Johnson's testing was performed at approximately 2 degrees of slope. Thus, absent evidence to the contrary, it is reasonable to conclude the degree of slope present at the accident scene and during testing were well within the SJIII's operating capabilities required by the ANSI standard.

Finally, the most relevant ANSI standard for this case requires stability testing be conducted while the lift is being driven. In particular, subpart 4.7.4.2 (Depression test) requires

> A dynamic stability test shall be performed on the *maximum slope* for which the aerial platform is rated by the manufacturer up to and including *maximum travel height* [26 feet]. The platform shall carry a

-17-

test load(s) whose center of gravity is located 6 inches (0.15m) above the platform floor(s) and distributed over the leading half of the platform(s) and *equal to the rated workload* [850 pounds]. The machine shall be driven into a 24 inch (0.60m) square hole with a vertical drop of 4 inches (0.10m) at its maximum attainable forward speed for that configuration with one front wheel aligned perpendicular to the edge of the test hole. The test shall also be performed at the *maximum attainable reverse speed* for that configuration with one rear wheel aligned perpendicular to an edge of the test hole.

Id. (emphasis added).

The testing conditions imposed by the ANSI standard are clearly set forth and equal or exceed those present during the accident and the testing performed by Johnson. The standard requires drop off testing be performed at maximum rated slope, with the work platform extended to its maximum height, under maximum load conditions, and at full operating speed. Thus, it was an abuse of discretion for the district court to refuse to allow Dr. Blundell to rely on Skyjack's own testing, which it concedes was done in compliance with the ANSI standard. Moreover, this testing strongly suggests Johnson's failure to account for an additional 84 pounds of load when he conducted his testing is not significant. To comply with the ANSI standard, the SJIII must remain stable when driven into a depression while loaded with nearly three times the weight present at the time of the accident.

The district court also refused to allow Dr. Blundell to rely on Skyjack's testing because it was performed to ensure compliance with an ANSI standard promulgated after the SJII lift was manufactured. The district court believed an ANSI standard would only be relevant to prove the manufacturer's product was not in compliance with industry standards or the "state of the art" at the time the product was manufactured. A state-of-the-art argument would be relevant if this was a products liability claim based on negligence, where the plaintiff might offer the then existing ANSI standard to argue the manufacturer knew or should have known about the

industry standard. Here, however, the ANSI standard is not being offered to show the SJII did not comply with a standard yet to be written. Instead, Plaintiffs argue 1) the SJIII could and should have been manufactured in 1995, 2) the SJIII meets the testing requirements imposed by the current ANSI standard, 3) the conditions required by the current ANSI standard equal or exceed the conditions present at the accident scene, and 4) the SJIII was a reasonable alternative design and would have prevented the accident.

The district court next concluded the SJII met the requirements of the 1990 ANSI standard which was in effect when it was manufactured in 1995, and therefore, reference to the 1999 ANSI standard is irrelevant. The 1990 ANSI standard is only relevant if a state-of-the-art defense could be asserted.

The district court also found Dr. Blundell's opinions unreliable because he based his opinion as to feasibility of manufacturing the SJIII in 1995, in part, on the fact another manufacturer (MEC) began outfitting its lifts with pothole protection as early as 1987. The district court found this information unreliable because Dr. Blundell 1) had no personal knowledge of MEC's earlier use of pothole protection, 2) did not test the MEC lift for stability, and 3) the MEC lift needed pothole protection to comply with the 1990 ANSI standard's stability requirements but the SJII lift did not. None of these contentions are relevant.

First, it does not matter from what source Dr. Blundell discovered MEC was utilizing pothole protection as early as 1987. The defendants do not dispute the fact and the information would be no less accurate if Dr. Blundell had actually observed the lift as opposed to having read about it in the literature and observed its operation in a videotape.

Second, stability testing on the MEC is irrelevant. Plaintiffs are not offering the MEC lift as a reasonable alternative. Instead, Plaintiffs argue pothole protection was

available as early as 1987, but not incorporated by Skyjack until 1997, which would have prevented the accident.

Third, it is irrelevant why MEC used pothole protection in 1987. The evidence is offered to prove pothole protection was available in 1987 and could have been in use by Skyjack when the SJII was manufactured in 1995.

Next, the district court reasoned Dr. Blundell's opinions were irrelevant and unreliable because "it is illogical to conclude that because a design is made today it could have been made in 1995." This argument is both factually and legally incorrect. The relevant time period to consider is whether a lift manufactured in 1997 could have been manufactured in 1995. Plaintiffs need not prove a lift manufactured in 2007 was feasible in 1995.

Additionally, the argument continues to rely on the fact the current ANSI standard did not become effective until 1999. According to the district court, the design and manufacture of a lift produced in 1995 could not be guided by a standard which did not yet exist. We agree, but as has been repeatedly noted, the 1999 ANSI standard is not being offered as evidence of the state of the art existing in 1995. Rather, plaintiffs offer the standard to aid in proving the feasibility of the pothole protection design.

As a further basis for rejecting Dr. Blundell's opinions, the district court found the current ANSI standard does not require pothole protection, and therefore, it does not support Plaintiffs' argument that pothole protection should have been used in 1995. The current ANSI standard requires lifts to remain stable under drop off conditions. Dr. Blundell testified every manufacturer today meets the requirement by outfitting their lifts with pothole protection. Thus, while the ANSI standard does not speak directly to pothole protection, it imposes requirements which have led all manufacturers to use pothole protection.

Finally, the district court and the defendants cite <u>Milanowicz v. The Raymond Corp.</u>, 148 F. Supp. 2d 525 (D. N.H. 2001), as authority for the district court's rejection of Plaintiffs' experts. <u>Milanowicz</u>, however, is easily distinguishable.

In <u>Milanowicz</u>, the plaintiff was injured while adjusting forks on a lift truck. <u>Id.</u> at 526. The plaintiff's expert testified powered fork positioners should have been incorporated into the truck's design. <u>Id.</u> at 538. The district court excluded the expert's testimony, because, among other things, the expert conceded the ANSI standard in effect at the time of the accident did not require such devices. <u>Id.</u> at 537. Furthermore, the expert could not identify any industry standard or literature which required his suggested alternative design, or any consumer or industry group which endorsed the alternative. <u>Id.</u> at 537-38. And finally, the expert did not test his proposed alternative design nor was he aware of any other testing which had been performed to determine the feasibility of his proposed design. <u>Id.</u> at 538-39.

As in <u>Milanowicz</u>, the SJII lift complied with the then existing ANSI standard, and based on this single similarity the district court and defendants conclude <u>Milanowicz</u> requires exclusion of plaintiffs' experts. In this case, however, unlike <u>Milanowicz</u>, the expert's proposed alternative design is supported by industry standards, literature, and testing. Dr. Blundell's testimony draws support from the 1999 ANSI standard which fully supports his proffered alternative design. Dr. Blundell testified his proposed alternative design comports with the current ANSI standard which imposes stability requirements which have led to the incorporation of pothole protection by every manufacturer of lifts. Furthermore, the industry standards and practices reflected in compliance with the ANSI standard support Dr. Blundell's opinions, i.e., pothole protection should be incorporated into lift designs to prevent overturning in drop off conditions. Finally, as evidenced by Skyjack's successful incorporation of pothole protection into the SJIII's design, Dr. Blundell's suggested alternative design has been fully tested.

Nonetheless, the district court, relying on several additional factors suggested in Milanowicz, found Dr. Blundell's opinions unreliable. See id. at 541 (suggesting a district court consider additional factors in its gatekeeping role, including, 1) federal standards, 2) standards established by independent organizations, 3) relevant literature, 4) industry practice, 5) product design and accident history, 6) charts and diagrams, 7) scientific testing, 8) feasibility of alternative design, and 9) risk utility of proposed alternative design). To the extent these factors are relevant to the current inquiry, we are satisfied Dr. Blundell's opinions comport with the additional requirements. While no party has offered any federal standards for consideration, Dr. Blundell's opinions take the relevant ANSI standards into account. Dr. Blundell also reviewed relevant literature and the current industry practices and concluded every manufacturer uses pothole protection. He also specifically considered stability testing of the SJIII, and the feasibility and risk utility of implementing the design in 1995.

We are satisfied Dr. Blundell's opinions survive review under Daubert. The proposed alternative design has been thoroughly tested and subjected to peer review and publication. Further, the known or potential rate of error has been considered and the theory has been widely accepted and implemented throughout the industry. Therefore, it was an abuse of discretion to exclude Dr. Blundell's testimony.

III

We reverse the order of the district court granting summary judgment and excluding the testimony of plaintiffs' experts, and remand for further proceedings consistent with this opinion.[6]

_____

[6]RSC argues it is a seller of goods and should be dismissed under Mo. Rev. Stat. § 537.762 which protects sellers of goods when the manufacturer is sued in a strict products liability claim. Because the district court did not reach this issue, we decline to consider it on appeal.